# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

RIVERKEEPER, INC.
                    Plaintiff,

v.

PASCAP CO., INC.
                    Defendant.

------------------------------------------------------------

Case No. 22-2999

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Riverkeeper, Inc. by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.      This action is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act" or "CWA"), to address and abate Defendant's ongoing and continuous violations of the Act.  33 U.S.C. § 1365.

2.      Defendant discharges polluted industrial stormwater from a scrap metal processing and recycling facility located at 4250 Boston Rd., Bronx, NY 10475 (the "Facility") into the Hutchinson River in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation ("DEC") SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgppermit.pdf ("General Permit").

3.      Defendant's violations of the General Permit and the Clean Water Act include, *inter alia*: inadequate pollution control measures; an inadequate stormwater pollution prevention

plan; failure to implement sufficient corrective actions; and the release of pollutants that cause or contribute to violations of water quality standards in receiving waters.

4. Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into the Hutchinson River and other receiving waters in this District. The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline. Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation. In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded. For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5. The Hutchinson River is one of these impaired waterbodies. New York State has determined that the Hutchinson River does not meet state water quality standards for dissolved oxygen and garbage and refuse. Dissolved oxygen is essential to all aquatic life – without it, aquatic organisms die and ecosystems collapse.

6. Defendant's stormwater discharges contribute to this endemic stormwater pollution problem. Defendant engages in industrial activities such as the storage and processing of scrap metal. As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters. Contaminated stormwater discharges

such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

### JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8. On February 10, 2022, Plaintiff provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant; Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 2; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3. A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

9. More than sixty days have passed since the notice letter was served on Defendant and the State and federal agencies. Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

10. Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

11.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

12.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.

## PARTIES

13.     Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a non-profit corporation whose mission is to protect and restore the Hudson River from source to sea and safeguard drinking water supplies, through advocacy rooted in community partnerships, science and law. Riverkeeper has approximately 3,100 members in the New York and New Jersey region, many of whom use and enjoy the Hutchinson River.

14.     Plaintiff's members use and enjoy the waters which Defendant has unlawfully polluted and are unlawfully polluting.  Plaintiff's members use those areas to fish, sail, boat, kayak, swim, birdwatch, photograph, view wildlife, engage in spiritual reflection, and engage in nature and scientific study, among other activities.  Defendant's discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA.

15.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

4

16.     Riverkeeper brings this action on behalf of itself and its members.  Riverkeeper's interest in reducing Defendant's discharges of pollutants into the Hutchinson River and requiring Defendant to comply with the requirements of the General Permit are germane to Riverkeeper's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Riverkeeper.

17.     Riverkeeper is informed and believes, and thereupon alleges, that Pascap Co., Inc. ("Pascap") is a corporation incorporated under the laws of the State of New York, that owns and/or operates the Facility.

**IV.**

**STATUTORY AND REGULATORY BACKGROUND**

**The Clean Water Act**

18.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

19.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

20.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive

requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

21.     In New York, DEC has been delegated the authority to issue NPDES permits.

Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the

Clean Water Act, are referred to as "SPDES" permits.

## Stormwater Permits

22.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress

enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial

Stormwater Discharges."

23.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated

stormwater discharge regulations at 40 C.F.R. § 122.26.

24.     In promulgating those regulations, EPA cited abundant data showing the harmful

effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular,

EPA found that runoff from industrial facilities contained elevated pollution levels and that, on

an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the

levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16,

1990).

25.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26

require NPDES permits for stormwater discharges "associated with industrial activity."

## New York's General Permit for the Discharge
## of Stormwater Associated with Industrial Activity

26.     As a delegated state NPDES permitting agency, the DEC has elected to issue a

statewide general permit for industrial stormwater discharges in New York.  The prior version of

the General Permit ("2012 Permit") was in effect between October 1, 2012, and September 30,

2017. *New York State Department of Environmental Conservation SPDES Multi-Sector General*

*Permit for Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-12-001

("2012 Permit"). The current version of the General Permit, which renewed the 2012 Permit,

went into effect on March 1, 2018, and will expire on February 28, 2023. Permit No. GP-0-17-

004 ("2018 Permit"). The 2018 Permit maintains or makes more stringent the same

requirements as the 2012 Permit. As appropriate, the 2012 Permit and the 2018 Permit are

referred to collectively as the "General Permit."

27.     Under the General Permit, permittees must comply with federal technology-based

standards. The Clean Water Act requires that any NPDES permit issued by a state must apply

and ensure compliance with, among other things, the Act's technology-based standards for

discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any

applicable requirements" of 33 U.S.C. § 1311). In turn, the Act's technology-based standards

dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants),

permitted dischargers shall apply "the best available technology economically achievable for

such category or class [of permitted dischargers], which will result in reasonable further progress

towards the national goal of eliminating the discharge of all pollutants . . ." 33 U.S.C.

§ 1311(b)(2)(A). The Act also sets a different standard, "application of the best conventional

pollution control technology" for a defined set of five "conventional pollutants." *Id.*

§ 1311(b)(2)(E).[1] *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall

include conditions that meet the Act's technology-based standards).

28.     Accordingly, the Act requires permittees to use best management practices

("BMPs") that reflect, and prohibit the discharge of pollutants above, the level commensurate

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40
CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform,
and oil and grease.

with application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  33 U.S.C. at §§ 1314(b)(2), (4).

29.     The General Permit also ensures compliance with state water quality standards. The Clean Water Act requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

30.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards.  *See* General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

31.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must either obtain coverage under the General Permit and comply with its terms or obtain coverage under and comply with an individual SPDES permit.  33 U.S.C. § 1311(a).

### The General Permit Framework

32.     The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's

conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision. *See* 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

33.     At the outset, the General Permit establishes eligibility conditions that permittees must meet in order to obtain coverage. General Permit, Part I. Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent. 2018 Permit, Part I.D.

34.     Next, the General Permit also contains a variety of substantive limits that all permittees must meet. These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices. *See* 2018 Permit, Part II.

35.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities. *See* 2018 Permit, Part VII.

36.     The General Permit sets forth additional non-numeric technology based effluent limits in the form of required BMPs for all facilities. 2018 Permit, Parts II.A.1-A.12; 2012 Permit, Part I.B.2. In addition, the General Permit sets forth additional non-numeric effluent limit requiring particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector"). 2018 Permit, Part VII; 2012 Permit, Part VIII.

37.     The General Permit implements the federal technology-based (BAT/BCT) standards through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants. *See* 2018 Permit, Part II; Part VII; 2012

Permit, Part I.B; Part VIII.  The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice."  2018 Permit, Part II; 2012 Permit, Part I.B.2.  BMPs include changes to industrial practices and activities (for example, annual employee training programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from a facility).

38.     As noted above, the General Permit also implements the Clean Water Act's water quality-based protections: it prohibits any discharge that may cause or contribute to a violation of New York's water quality standards as contained in 6 NYCRR Parts 700-705.  2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2. Water Quality Based Effluent Limitation II.C.1.c of the 2018 Permit holds that "any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited."

39.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting best management practices ("BMPs") and other stormwater control measures.  *See* General Permit Part II.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  General

10

Permit, Part II, Part III.A.7.

40.    A permittee must record the BMPs and control measures used to meet the General Permit's effluent limits in a "stormwater pollution prevention plan" ("SWPPP"). General Permit, Part III.  The owner or operator must develop, implement, and continually update the plan.  General Permit, Part III.

41.    Further, permittees must track, improve upon, and report upon their performance under the General Permit.  The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary.  *See* General Permit Parts IV–VI.

42.    The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" ("benchmarks") for each pollutant, in order to ensure that permittees are complying with the limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

43.    A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans."  60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

44.    Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the

federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

### **Key Conditions of the General Permit**

45.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

#### Benchmarks and Water Quality Standards

46.     For facilities in Sector N, the General Permit establishes the following benchmarks: total suspended solids ("TSS") – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, oil & grease ("O&G")– 15 mg/L, total recoverable aluminum – 750 µg/L, total recoverable cadmium – 1.8 µg/L, total chromium – 1.8 mg/L, total recoverable copper – 12 µg/L, total recoverable iron – 1 mg/L, total recoverable lead – 69 µg/L, and total recoverable zinc – 110 µg/L.

47.     For water bodies with a designation of Class SB, Table 1 of 6 NYCRR Section 703.5 provides the following water quality standards for pollutants that are discharged from the Facility: copper – 4.8 µg/L.

#### SWPPP Requirements

48.     The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General

Permit, including achievement of effluent limitations.  2018 Permit, Part III.A; 2012 Permit, Part III.A.

49.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility. 2018 Permit, Part III.A; 2012 Permit, Part III.C.

50.     The General Permit also includes sector-specific SWPPP requirements.  For facilities in Sector N (including Subsector N3), these requirements include, *inter alia*, a program to control materials received for processing; BMPs to minimize contact of particulate matter stored indoors or under cover from contacting surface runoff; BMPs to minimize contact of stormwater runoff with stockpiled materials, processed materials, and non-recyclable wastes; BMPs to minimize contact of residual liquids and particulate matter from materials stored indoors or under cover from coming in contact with surface runoff; a program to control what is received at the facility; measures necessary to minimize contact of surface runoff with residual cutting fluids; BMPs to minimize surface runoff from coming in contact with scrap processing equipment; and measures to minimize stormwater contamination at loading/unloading areas. 2018 Permit, Part VII.N; 2012 Permit, Part VIII.N.

51.     For facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks as set forth in Appendix G of

the 2018 Permit, a facility must contain the following SWPPP requirements: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, an identification of each area of the facility that generates stormwater discharges associated with industrial activity that creates a reasonable potential to discharges the pollutants of concern, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody.  2018 Permit, Part III.D.2.a-d.

Monitoring and Reporting

52.     The General Permit requires operators to collect and analyze samples of industrial stormwater discharges resulting from measurable storm events from every outfall at a facility. The 2018 Permit requires such sampling and analysis to occur twice per year; the 2012 Permit requires sampling and analysis to occur annually.  2018 Permit, Parts IV and VI; 2012 Permit, Part, IV.

53.     The General Permit requires that facilities discharging stormwater to impaired waterbodies conduct additional monitoring.  Facilities in Sector N3 that are discharging to waters impaired for low dissolved oxygen are required to conduct quarterly monitoring of stormwater discharges.  2018 Permit, Parts IV.F.1.c, IV.F.2, Appx. G; 2012 Permit, Part IV.B.1.g, Appx. G.

54.     The General Permit requires that facilities that have an exceedance of a numeric effluent limit, or an exceedance of a benchmark cut-off concentration for a pollutant of concern to an impaired waterbody (i.e. a pollutant that is associated with the impairment), must report the results of the exceedance(s) and the corrective action(s) taken on a Corrective Action form along with the submission of the DMR reporting that exceedance.  2018 Permit, Parts VI.A.2.b, VI.B (Table VI.1); 2012 Permit, Part IV.B.1.g.(6).

Corrective Actions

55.     The General Permit requires "corrective actions" to improve BMPs when, *inter alia*, "the benchmark or numeric effluent limit [stormwater] sample results indicate exceedances of the pollutants."  2018 Permit Part V.A; 2012 Permit Parts IV.B.1.c.(6).(a)-(b), IV.B.1.e.(5).(a)-(b).  A discharger must implement additional structural and non-structural BMPs to prevent a recurrence of those exceedances within 12 weeks.  2018 Permit, Part V.A.1; 2012 Permit, Part III.E.2.b.(1).  If the exceedances still continue, the discharger must continue implementing additional BMPs.  2018 Permit, Part V.A.4; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).  Corrective actions are also required if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards."  2018 Permit, Part II.C.1.b; See also 2012 Permit, Part I.B.3.  A failure to take the necessary and required corrective actions is a violation of the permit.  2018 Permit, Parts V, II.C.1.b; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).

**Beneficial Uses of New York Surface Waters**

56.     The DEC has classified the portion of the Hutchinson River where the Facility discharges as a Class SB water.  6 N.Y.C.R.R. § 865.6.

57.     Under New York's Water Quality Standards, a waterbody that is designated Class SB is meant to be suitable for primary and secondary contact recreation, fishing, and for fish, shellfish, and wildlife propagation and survival.  6 N.Y.C.R.R. § 7011.1.

58.     The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.  *See generally* 6 N.Y.C.R.R. §§ 702, 703.  A waterbody must meet these numeric and narrative criteria in order to

support its designated uses.  *See id*. §§ 702.2, 702.9.

59.     The DEC has designated the Hutchinson River as impaired pursuant to CWA

Section 303(d) for failure to meet minimum water quality standards for dissolved oxygen and

garbage and refuse.  *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*,

N.Y. DEP'T ENVTL. CONSERVATION, 31 (June 2020).

### CWA Citizen Enforcement Suits

60.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may

commence a civil action in federal court on his own behalf against any person who is alleged to

be in violation of an "effluent standard or limitation" under the CWA.

61.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a),

includes an action seeking remedies for an unpermitted discharge in violation of CWA

Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant

to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

62.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting

U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further

necessary relief based on such a declaration).

63.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

64.     Violators of the Clean Water Act are also subject to an assessment of civil

penalties of up to $59,973 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d),

1365(a); 40 C.F.R. §§ 19.1–19.4.

### V.

### STATEMENT OF FACTS

### Metal Recycling Facilities

65.     Metal recycling facilities, especially those with outdoor stockpiling, processing,

and segregation of materials, have been identified as a major source of stormwater

contamination.  Scrap metal in different stages of corrosion and decay may release a variety of

harmful substances, including but not limited to heavy metals, fuel, oil, lubricants,

polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene

glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants

associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also id*. at

51189–97 (outlining special requirements for Sector N).

66.     In addition to the storage and processing of various sources of scrap metal, such

facilities also conduct vehicle operation and maintenance and equipment operation and storage.

Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to

areas on and off the premises.  Vehicles also expose many other sources of pollution to the

elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

### The Facility and Industrial Stormwater Discharges

67.     The Facility is classified under Standard Industrial Classification ("SIC") Code

5093, meaning that it is primarily engaged in the assembling, breaking up, sorting, and wholesale

distribution of scrap and waste materials.  Activities in this SIC Code are subject to the General

Permit's effluent limits for industrial Sector N.

68.     Within Sector N, the General Permit further divides recycling facilities into

various sub-sectors, labeled N1 to N5, based on the kinds of recycling activities that occur on site

and the potential of those activities to release pollution.  The Facility is a Sector N3 facility.  A

Sector N facility must comply with all of the General Permit's universal requirements, all

requirements that apply to every Sector N facility, and all requirements that apply to any of the

subsectors that describe the facility's recycling activities.

69.     The Facility collects and discharges stormwater from its 8.3-acre industrial site

through at least one discharge location.  Defendant has certified that the receiving water for stormwater discharges from the Facility is the Hutchinson River.

70.     The Facility receives a variety of waste materials, primarily ferrous and non-ferrous metals, and store, process, crush, and compact these materials.  The majority of activity and storage at the Facility takes place outdoors, where pollutants are exposed to stormwater.

71.     When it rains, the majority of stormwater from the Facility comes from, or is commingled with runoff from, areas at the Facility where industrial processes occur.

72.     Stormwater flowing over areas of the Facility that are associated with Defendant's industrial activities collects a variety of pollutants, including but not limited to sizeable debris, sediment, oil and grease, metals, organic substances and chemicals that create chemical oxygen demand or alter the pH of receiving waters, and other pollutants.

73.     Stormwater discharged from the Facility flows directly to the Hutchinson River.  The Hutchinson River is a water of the United States.

#### Defendant's General Permit Coverage

74.     Defendant has applied for and obtained coverage for the Facility under the General Permit via a Notice of Intent ("NOI") to comply with the terms of the General Permit that Defendant submitted to the DEC.

75.     The Facility discharges under Permit ID No. NYR00B708.

#### Defendant Discharges Excessively Polluted Stormwater

76.     Defendant has taken samples or arranged for samples to be taken of stormwater discharges from the Facility.  The sample results were either reported to the DEC on written discharge monitoring reports or to the EPA and DEC jointly through EPA's electronic system for submission of discharge monitoring reports online.  Defendant certified each of those reports pursuant to the General Permit.

18

77.     In these stormwater sampling results, the Facility has consistently reported high pollutant levels that exceed applicable benchmarks and are evidence of ongoing violations of the effluent limitations set forth in the General Permit.

Benchmark Exceedances

78.     In the past five years, the Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including aluminum, COD, copper, iron, lead, and zinc.

79.     The levels of aluminum in stormwater detected by the Facility have exceeded the cut-off concentration for aluminum of 750 µg/L established by the DEC.  In the second half of 2020, the level of aluminum measured at the Facility's stormwater outfall was 804 µg/L.

80.     The levels of COD in stormwater detected by the Facility have exceeded the cut-off concentration for COD of 120 mg/L established by the DEC.  For the annual period of 2017, the level of COD measured at the Facility's stormwater outfall was 59,000 mg/L, which is over 491 times the cut-off concentration.

81.     The levels of copper in stormwater detected by the Facility have exceeded the cut-off concentration for copper of 12 µg/L established by the DEC.  For example, in the first half of 2021, the level of copper measured at the Facility's stormwater outfall was 90.42 µg/L, which is over 7 times the cut-off concentration.  Defendant also has measured levels of copper in excess of 12 µg/L in stormwater discharged from the Facility during the following sampling periods: annual period of 2017, the first half of 2019, the second half of 2019, the first half of 2020, the second half of 2020, and the second half of 2021.

82.     The levels of iron in stormwater detected by the Facility have exceeded the cut-off concentration for iron of 1 mg/L established by the DEC.  For example, in the first half of

2020, the level of iron measured at the Facility's stormwater outfall was 3.4 mg/L, which is over 3 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1 mg/L in stormwater discharged from the Facility during the following sampling periods: the annual period of 2017, the second half of 2018, the first half of 2019, the second half of 2019, the second half of 2020, the first half of 2021, and the second half of 2021.

83.    The levels of lead in stormwater detected by the Facility have exceeded the cut-off concentration for lead of 69 μg/L established by the DEC.  For example, in the second half of 2020, the level of lead measured at the Facility's stormwater outfall was 194 μg/L, which is more than 2 times the cut-off concentration.  Defendant also has measured levels of lead in excess of 69 μg/L in stormwater discharged from the Facility during the following sampling periods: the second half of 2019, the first half of 2021, and the second half of 2021.

84.    The levels of zinc in stormwater detected by the Facility have exceeded the cut-off concentration for zinc of 110 μg/L established by the DEC.  For example, in the first half of 2020, the level of zinc measured at the Facility's stormwater outfall was 1,178 μg/L, which is over 10 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 110 μg/L in stormwater discharged from the Facility during the following sampling periods: the annual period of 2017, the first half of 2019, the second half of 2019, the second half of 2020, the first half of 2021, and the second half of 2021.

85.    These benchmark exceedances are evidence of ongoing violations of the non-numeric effluent limitations set forth in the General Permit at the Facility.

<u>Violations of Water Quality Standards</u>

86.    In stormwater sampling results, the Facility has also reported high pollutant levels that Plaintiff alleges cause or contribute to violations of applicable New York water quality

20

standards.

87.    During the past five years, the Facility reported a discharge of stormwater from the Facility that exceeded applicable New York water quality standards for Class SB waters, including copper (A(A)).

88.    The levels of copper in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 4.8 µg/L for copper (A(A)).  For example, in the first half of 2021, the level of copper measured at the Facility's stormwater outfall was 90.42 µg/L, which is over 18 times the standard.  Defendant also has measured levels of copper in excess of 4.8 µg/L in stormwater discharged from the Facility during the following sampling periods: annual period of 2017, the first half of 2019, the second half of 2019, the first half of 2020, the second half of 2020, and the second half of 2021.

## Defendant's Inadequate Pollution Prevention Practices

89.    On information and belief, Plaintiff alleges that there are insufficient stormwater control measures and BMPs installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate stormwater pollution treatment technologies to treat stormwater once contaminated.

90.    On information and belief, Plaintiff alleges that track-out pollution (pollution carried on and falling off vehicles and their tires) is found on Defendant's access roadways and

near the entrances/exits to the Facility.  Stormwater washes these pollutants into storm drains that discharge into the receiving waters.

91.     Based on the inadequacy of pollution prevention practices and the repeated exceedances of benchmarks and water quality standards, Plaintiff alleges that since at least February 12, 2017, Defendant has failed to implement BAT and BCT at the Facility for its discharges of iron, aluminum, copper, lead, zinc, and COD.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

<u>Inadequate SWPPP</u>

92.     On information and belief, Plaintiff alleges that Defendant has not implemented an adequate SWPPP for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP for the Facility does not set forth adequate site-specific BMPs, such as housekeeping measures, or adequate structural control measures to be consistent with BAT or BCT for the Facility, and to meet the General Permit's requirement to minimize pollutant discharges.

93.     Further, on information and belief, Plaintiff alleges that Defendant has failed to keep the SWPPP for the Facility current by amending it whenever there are changes in design, construction, operation, or maintenance at the Facility that affect the potential to discharge pollutants, or whenever the SWPPP has been found to be ineffective in eliminating or significantly minimizing pollutants.

<u>Inadequate Corrective Actions</u>

94.     On information and belief, Plaintiff alleges that Defendant has failed to implement sufficient corrective actions, as evidenced by the Facility's continued stormwater sample results with exceedances of applicable benchmarks and with the reasonable potential to

cause or contribute to a violation of water quality standards (as alleged in Sections II.A–B of Exhibit A), as set forth in Exhibit A, § II.D, and incorporated by reference.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Failure to Implement the Best Available and Best Conventional Treatment Technologies
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

95.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

96.     The General Permit requires Defendant to implement mandatory general and sector-specific control measures and BMPs in order to minimize the discharge of pollutants from the Facility.

97.     Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice." 2018 Permit, Part II; 2012 Permit, Part I.B.2.

98.     To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged. CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

99.     Based on the industrial activities carried out at the Facility, Defendant must implement the sector-specific control measures specified in the General Permit for Sector N.

23

100.    Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this Complaint, Defendant has not implemented adequate control measures or BMPs required by the General Permit.

101.    Defendant has failed to implement control measures that meet the BAT/BCT standards at the Facility for its discharges of iron, aluminum, copper, lead, zinc, and COD in violation of applicable benchmarks and water quality standards set forth in and incorporated by the General Permit.

102.    Each day since February 12, 2017, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

103.    Defendant has been in violation of the BAT/BCT requirements every day since February 12, 2017.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**<u>SECOND CAUSE OF ACTION</u>**

**Causing or Contributing to Violation of Water Quality Standards**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

104.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

105.    The General Permit states that "[i]t shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705." 2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2.

106.    Plaintiff is informed and believes, and thereupon alleges, that since at least February 12, 2017, Defendant has been discharging polluted stormwater from the Facility in

excess of the applicable water quality standard for copper in violation of Water Quality Based

Effluent Limitation II.C.1.a of the General Permit.

107.    During every rain event, stormwater flows freely over exposed materials, waste

products, and other accumulated pollutants at the Facility, becoming contaminated with

pollutants at levels above applicable water quality standards.  The stormwater from the Facility

flows untreated into the Hutchinson River.

108.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

contaminated stormwater are causing or contributing to the violation of the applicable water

quality standards in 6 NYCRR Parts 700–705 in violation of Water Quality Based Effluent

Limitation II.C.1.a of the General Permit.

109.    Every day since at least February 12, 2017, that Defendant has discharged and

continues to discharge polluted stormwater from the Facility in violation of the General Permit is

a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an
Adequate Stormwater Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

110.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

111.    The General Permit requires industrial dischargers to develop, implement, and

maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

112.    The SWPPP must identify potential sources of pollution that may affect the

quality of stormwater discharges associated with the discharger's industrial activity.

113.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

114.    The SWPPP must address both universally applicable elements as well as sector-specific requirements.

115.    The SWPPP must be representative of current site conditions and kept up to date. Defendant has failed to develop, implement, and keep up to date an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at the Facility and by the Facility's continuing discharges of excessively polluted stormwater.

116.    Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's stormwater monitoring.

117.    Each day since February 12, 2017, that Defendant has failed to develop, implement and update adequate a SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

118.    Defendant has been in violation of the SWPPP requirements every day since February 12, 2017.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**FOURTH CAUSE OF ACTION**
**Failure to Take Corrective Actions**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

119.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

120.    When stormwater discharges from a facility have high levels of pollutants that exceed applicable concentrations, limits, and standards, the General Permit requires operators to take "corrective actions" to improve BMPs to eliminate those exceedances.  A failure to take the necessary and required corrective actions is a violation of the permit.

121.    Plaintiff is informed and believe, and thereupon alleges, that Defendant has failed to implement sufficient corrective actions at the Facility in response to the Facility's continued stormwater sample results with exceedances of applicable benchmarks and with the reasonable potential to cause or contribute to a violation of water quality standards.

122.    Each day since February 12, 2017, on which Defendant failed to comply with the General Permit's requirement to take sufficient corrective actions is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

## VII.

## PRAYER FOR RELIEF

123.    Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.    Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.    Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with the General Permit;

c.    Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendant to immediately implement stormwater pollution control and treatment technologies and measures that are equivalent to BAT and/or BCT;

e.   Order Defendant to immediately implement stormwater pollution control and treatment technologies and measures that prevent pollutants in the Facility's stormwater from contributing to violations of any applicable water quality standards;

f.   Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $59,973 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

l.   Award any such other and further relief as this Court may deem appropriate.

Dated this 12th day of April 2022

New York, New York

Respectfully submitted,

By:  /s/ Edan Rotenberg

Edan Rotenberg
SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005

*Attorney for Plaintiffs*